**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 26, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

---

STEWART TITLE GUARANTY
COMPANY, a Texas corporation,

     Plaintiff-Appellee/Cross
     Appellant,

v.

HARALD DUDE, individually and as
general partner of Dee Investments
Limited Partnership, a Nevada limited
partnership,

     Defendant-Appellant/Cross-
     Appellee,

and

DENISE ROBERTS, individually and
as a general partner of Dee
Investments Limited Partnership, a
Nevada limited partnership,

     Defendant,

v.

DEE INVESTMENTS LIMITED
PARTNERSHIP, a Nevada limited
partnership,

     Third-Party-Defendant-
     Appellant/Cross-Appellee,

Nos. 11-1374 & 11-1393

and

WEAVER & MITCHELL, INC.;
STEWART TITLE OF COLORADO
INC.; DAVID LESTER,

     Third-Party-Defendants.

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:07-CV-02299-RPM)**

---

Stephen C. Harkess of Harkess & Salter LLC, Lakewood, Colorado, for
Defendant-Appellant/Cross-Appellee.

Laurence W. DeMuth, III, (Jennifer K. Harrison, Faegre Baker Daniels LLP,
Denver, Colorado, with him on the briefs) of Faegre Baker Daniels LLP, Boulder,
Colorado, for Plaintiff-Appellee/Cross-Appellant.

---

Before **BRISCOE,** Chief Judge, **GORSUCH,** and **MATHESON**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

    Harald Dude's real estate dealings began breaking bad in 2003. After
securing a $1.9 million loan from Washington Mutual on a house he owned in
Aspen, Mr. Dude quickly sought to borrow another $500,000 from Wells Fargo.
To satisfy Wells Fargo, Mr. Dude had to complete a form for the bank's title
insurance company, Stewart Title. On that form, he was asked to disclose
existing liens and loans on the property, at least those that hadn't already turned

up in Stewart Title's title search. Knowing the company had failed to discover the existence of the Washington Mutual loan and worried that disclosing it now might scotch any chance he had of winning a second loan from Wells Fargo, Mr. Dude decided to conceal its existence. The plan worked: Stewart Title and Wells Fargo proceeded with the second loan just as Mr. Dude had hoped.

Three years later Mr. Dude hatched an even more elaborate scheme. Along with his wife and their real estate agent, David Lester, Mr. Dude decided to sell the Aspen property. Soon a buyer came along and soon Stewart Title was contacted to provide the title insurance. Once more Stewart Title's search failed to reveal the Washington Mutual loan (it turns out the loan was defectively recorded). Once more the company presented Mr. Dude with a form asking about loans and liens on the property. Eyeing their main chance, the trio agreed to hide its existence (once more). If Stewart Title continued to remain in the dark about the loan, Mr. Dude and his compatriots hoped at closing the company would direct to them $1.9 million in sale proceeds that rightly belonged to Washington Mutual. In eager anticipation of the happy windfall, the three celebrated at Mr. Dude's home in Palm Beach with dinner, drinks, and cigars.

At first, all proceeded as planned. Relying on the 2003 and 2006 forms Mr. Dude and his co-conspirators completed and still in the dark about the Washington Mutual loan, at closing Stewart Title distributed nothing to

Washington Mutual and sent an extra $1.9 million to Mr. Dude, his wife, and Mr. Lester.

But as these things tend to go, the scheme soon began to unravel. When Mr. Dude decided to stop making payments on the Washington Mutual loan, the bank surfaced and was none too pleased. Eventually it threatened the property's new owner, Rosalina Yue, with foreclosure; in turn, Ms. Yue made a claim on her title insurance with Stewart Title. Honoring what it perceived to be its contractual obligations, Stewart Title paid Washington Mutual's loan amount in full, some $1.95 million by now.

The dominoes continued to fall. Eventually coming to appreciate how much Mr. Dude's deception had cost it, Stewart Title brought this diversity lawsuit against him, his company Dee Investments, his wife, Mr. Lester, and others. By the time of trial, only Mr. Dude and his company were left standing: the others settled or sought shelter in bankruptcy. At the end of it all the jury found Mr. Dude and his company liable for (among other things) fraudulent misrepresentation under Colorado law, awarding punitive as well as actual damages.

Now on appeal Mr. Dude and his company seek to recoup their lost windfall. To achieve this feat, they argue Stewart Title failed to present sufficient evidence of an essential element at trial. In Colorado, as in most places, it's not enough to show that the defendant made a material misrepresentation of fact on

which the plaintiff relied, or that the misrepresentation caused the plaintiff's damages. To win a claim for fraudulent concealment, the plaintiff must also show its reliance on the defendant's misrepresentation was justifiable. *See, e.g.*, *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1382 (Colo. 1994). And it is this element, Mr. Dude says, that's his ace in the hole.

The precise work performed by the adjectival epithet "justifiable" when it comes to the reliance element in fraud is more than a little elusive. Everyone agrees it operates to allocate the risk of loss to an actually deceived plaintiff in *some* circumstances. But that may be where the agreement ends. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 108, at 750 (5th ed. 1984). Some understand the law as requiring the plaintiff to ferret out the facts from even the vaguest intimations or else bear the risk of loss. *Id.* Others read it as imposing no duty to investigate at all and allocating the risk of loss only to the most foolish of plaintiffs. *Id.* Happily, to decide this case we don't have to decide this debate. Mr. Dude presents two discrete theories of justifiable reliance and we can limit our discussion in this appeal to their terms without touching broader and more difficult questions.

In his first theory, Mr. Dude proceeds on the assumption that, whatever else it may mean, at the very least the justifiable reliance element means "[a] party cannot reasonably rely on a misrepresentation it knows to be false." Opening Br. at 11 (citing *Loveland Essential Grp. v. Grommon Farms, Inc.*, 251 P.3d 1109,

1117 (Colo. App. 2010)).  And Mr. Dude submits Stewart Title knew he was lying all along.  By way of support, Mr. Dude points to Stewart Title's forms which asked him and his co-conspirators if there were "loans . . . or liens . . . of any kind" on the Aspen property and they responded "none."  Stewart Title knew this answer was false, Mr. Dude says, because its own title research, reflected in its title commitment papers, mentions a number of existing loans and liens, like one belonging to Merrill Lynch.  It is in this way, Mr. Dude claims, Stewart Title knew he was a liar from the start.

But for all Mr. Dude's self-deprecation, he once again fails to disclose some important facts.  The 2003 and 2006 forms include a separate line in which Mr. Dude and his co-conspirators were asked to (and did) represent that "I/we further affirm that I/we have not taken out any loans against our property *other than* those shown on the above referenced" title commitment documents Stewart Title had already prepared.  Aplt. App. Vol. 5, at 541 (emphasis added).  And, as Mr. Dude points out, all loans and liens *except* the Washington Mutual loan were listed in Stewart Title's 2003 and 2006 title commitment documents.  A Stewart Title loan examiner, Charles Dorn, testified at trial that the company expects a borrower or seller filling out its forms to disclose only loans or liens that fail to appear in its title commitment documents.  No one's expected to repeat information Stewart Title has already gleaned from its title search, but only to ensure the information the company has found is complete.  For this reason, Mr.

-6-

Dorn testified, Stewart Title had no reason to suspect foul play. The company knew of all other loans and liens on the property; it listed these on its title commitment letter shown to Mr. Dude and his colleagues; it asked them to disclose any other loans or liens; and in response it received a deliberately false representation that no other loans or liens existed.

To all this, Mr. Dude replies that Stewart Title can't read its own form. As he interprets it, the line seeking disclosure of "loans . . . or liens of any kind" required him to disclose *all* loans, and this line isn't modified by the later line seeking disclosure only of loans "*other than* those shown on the" title commitment. But this argument mistakes the nature of this case and the limits of our review. This isn't a contract dispute at summary judgment where we are called on to decide as a matter of law the optimal reading of two lines in some form agreement. This is a fraud dispute on appeal after a trial where the jury was properly instructed and Mr. Dude is left to argue only the insufficiency of the evidence to support its verdict. To prevail in *these* circumstances, Mr. Dude faces the daunting job of having to show that "the evidence points but one way [his way] and is susceptible to no reasonable inferences supporting the party opposing the motion; we must construe the evidence and inferences most favorably to the non-moving party." *Pegasus Helicopters, Inc. v. United Techs. Corp.*, 35 F.3d 507, 510 (10th Cir. 1994) (alterations omitted); Fed. R. Civ. P. 50(b).

So it is that we are not called on to decide the best reading of Stewart Title's form, only whether (as Mr. Dude has framed the justifiable reliance inquiry) there is *some* competent evidence in the record that Stewart Title was unaware of the falsity of his representations. And plainly there is. Stewart Title offered testimony from Mr. Dorn explaining how and why the company was left in the dark. The jury might have been free to discredit that evidence, but evidence there was.

In his second argument for reversal, Mr. Dude approaches the question of justifiable reliance from an entirely different angle. He argues that Stewart Title "constructively" knew of his fraud because the Washington Mutual loan was publicly recorded. All Stewart Title had to do, he says, is visit the county clerk's office to find it. The company's failure to do so, he says, renders its reliance on him unjustifiable.

Whether a fraud plaintiff has to rifle through county records before its reliance on a defendant's misrepresentation qualifies as "justifiable" turns out to be an interesting question. There are certainly some who think the adjectival epithet is not so demanding. *Cf.* Restatement (Second) of Torts § 540, cmt. b ("[R]ecording acts are not intended as protection for fraudulent liars. Their purpose is to afford protection to persons who buy a recorded title against those who, having obtained a paper title, have failed to record it. The purpose of the [recording] statutes is fully accomplished without giving them a collateral effect

that protects those who make misrepresentations from liability."). Whether Colorado is among them, however, is less clear. *See Vinton v. Virzi*, 269 P.3d 1242, 1247 (Colo. 2012) (suggesting generally "that if a party claiming fraud has access to information that was equally available to both parties and would have led to the true facts, that party has no right to rely on a false representation").

What is clear is that under even the more demanding of these conceptions Mr. Dude doesn't have a winning argument. The record shows that Stewart Title *did* look for recorded loans and liens on the property and failed to find the Washington Mutual loan only because the deed was defectively recorded. Defectively recorded because the Washington Mutual documentation contained no legal description of the property and so wasn't clearly associated with the property in the clerk's files. And under Colorado law we know that, even when it comes to real property law, "a recorded deed of trust that completely omits a legal description is defectively recorded and cannot provide constructive notice to a subsequent purchaser of another party's security interest in the property." *Sender v. Cygan (In re Rivera)*, No. 11SA261, 2012 WL 1994873, at *2 (Colo. June 4, 2012). If that's true when it comes to a bona fide purchaser's obligations under property law, we are at a loss how more might be required of a plaintiff seeking recovery in fraud.

At this point a reader might wonder whether Mr. Dude could have tried another and altogether different line of attack. To win a claim for fraudulent

misrepresentation, a plaintiff has to prove its damages. If Washington Mutual didn't record its loan properly and Stewart Title didn't have constructive notice of it, then neither did Ms. Yue. As a bona fide purchaser for value, one might wonder whether she — and so Stewart Title, as her title insurer — had any obligation to pay Washington Mutual's loan. At least one might ask whether the full measure of Stewart Title's losses were caused by Mr. Dude's fraud rather than Washington Mutual's defective recording. Allusions to this potential line of attack can be found in Mr. Dude's briefing. But fortunately for Stewart Title, these hints and feints are never developed and Mr. Dude always retreats to framing his appeal in terms of justifiable reliance. And perhaps this is because he has to: it is unclear whether Mr. Dude preserved in the district court the necessary objections to Stewart Title's claimed damages or their cause. But whatever the reason these arguments are not developed, the fact is they are not. And it isn't our obligation to pursue a potential avenue for reversal that no one's asked us to explore.

One more note. While Stewart Title won its fraudulent misrepresentation claim, the district court dismissed the company's fraudulent concealment claim. Stewart Title cross-appeals seeking to have this ruling reversed. The two claims are, of course, mirror images: the first focusing on wrongs of commission, the other on wrongs of omission, and it's easy to exaggerate the clarity of the line separating the two. *See* 1 Dan B. Dobbs, et al., *The Law of Torts* § 126, at 396-

397 (2d. ed. 2011). But as Stewart Title acknowledged at oral argument, the district court's dismissal of its fraudulent omission claim hardly matters now. Anything the company might have won on the dismissed omission claim it has already won on the remaining commission claim. There is, then, no reason to tangle with the task of trying to distinguish acts and omissions in this case. Any conceivable error the district court might have committed in dismissing the company's fraudulent concealment claim could only be harmless. *See* Fed. R. Civ. P. 61.

Affirmed.